IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NATIONAL COUNCIL OF THE
UNITED STATES SOCIETY OF
ST. VINCENT DE PAUL, INC.,

                  Plaintiff,

    v.

ST. VINCENT DE PAUL COMMUNITY
CENTER OF PORTAGE COUNTY, INC.,

                  Defendant.

OPINION AND ORDER

16-cv-423-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an action for trademark infringement and unfair competition, brought under the Lanham Act, 15 U.S.C. §§ 1051-112l. Plaintiff National Council of the United States Society of St. Vincent de Paul, Inc., which is a Catholic charitable organization dedicated to raising money for the poor, contends that defendant St. Vincent de Paul Community Center of Portage County, Inc. has used plaintiff's trademarks and service marks illegally. It seeks injunctive relief, damages and disgorgement of profits. Defendant has asserted the affirmative defenses of laches, acquiescence, waiver, equitable estoppel, abandonment and classic fair use and has brought a counterclaim of unjust enrichment.

Now before the court are plaintiff's motion for summary judgment on its Lanham Act claim for injunctive (but not monetary) relief and defendant's counterclaim and affirmative defenses, dkt. #52, and defendant's motion for summary judgment with respect to laches,

dkt. #36.  Also before the court is the parties' joint motion to amend or correct the pretrial order, in which the parties ask that the court vacate the remaining pretrial deadlines and set a later trial date.  Dkt. #83.  For the following reasons, I am (1) denying plaintiff's motion with respect to its Lanham Act claim and defendant's affirmative defenses of laches and classic fair use; (2) granting plaintiff's motion with respect to defendant's unjust enrichment counterclaim and affirmative defenses of acquiescence, waiver, equitable estoppel and abandonment; (3) denying defendant's motion for summary judgment with respect to laches; and (4) granting the parties' joint motion to reset the remaining pretrial deadlines and trial date.

From the parties' proposed findings of fact, I find that the following facts are undisputed, unless otherwise noted.  I have not considered the additional proposed findings of fact, dkt. #77, that plaintiff filed in conjunction with its reply brief in support of its motion because defendant did not have the opportunity to dispute or otherwise respond to those proposed findings.

## UNDISPUTED FACTS

### A.  The Parties

1.  Plaintiff

Plaintiff National Council of the United States Society of St. Vincent de Paul, Inc. is a non-profit, charitable, Catholic lay organization that was founded in the United States in 1845.  It provides services to the needy in 4,600 communities across the United States,

including several communities in Wisconsin. Plaintiff began operating in Wisconsin in 1849, and it formally incorporated under the laws of the state of Delaware on June 13, 1946.

Plaintiff's main office is in St. Louis, Missouri, but it is affiliated with approximately 5,000 independently-operated local "councils" and "conferences" that carry out plaintiff's mission of providing charitable services to individuals in their homes and operating thrift stores, meal programs, housing programs and free pharmacies across the United States. The conferences operate within a specific council area, and both councils and conferences are distinct legal entities. For example, the District Council of Madison, Inc., Society of St. Vincent de Paul was incorporated in 1941; the St. Vincent de Paul Society of Portage, Inc. was incorporated in 1973; the St. John, Marshfield Conference was incorporated in 1982; the St. Vincent de Paul Cabrini Conference in Wausau, Wisconsin was incorporated in 2008; and the St. Vincent de Paul Society St. Joseph Conference, Inc. (or the "Baraboo Conference") has been operating since 1911 and incorporated in 1961.

For most of its history, plaintiff was loosely organized, with only a volunteer, part-time chief executive and three or four full-time employees working out of the St. Louis office. In 2006, plaintiff attempted to form a more sophisticated system of corporate governance and management by making the executive director a paid position; this later became the position of chief executive officer. Plaintiff also organized its operations into several regions that were overseen by volunteer regional vice presidents who serve as liaisons between plaintiff and the local affiliates in their regions. Plaintiff currently has 19 employees in its St. Louis office.

2. Defendant

Defendant St. Vincent de Paul Community Center of Portage County, Inc. was organized and incorporated under the laws of Wisconsin in 1984. It is not affiliated or associated with plaintiff. Beginning in 1984, defendant maintained and operated a "St. Vincent de Paul Thrift Store" in Plover, Wisconsin. In 2014, defendant moved the thrift store four miles away, to Stevens Point, Wisconsin, where it sells goods at discount prices using the name "St. Vinnies Thrift Store." It also operates a food pantry and flea market using a similar name.

B. The Contested Marks

1. Plaintiff's undisputed use of marks

Plaintiff registered the following design mark on September 14, 1999:



Plaintiff registered the "Society of St. Vincent de Paul" word mark on July 29, 2014; the "St. Vinnys Bistro" mark on October 19, 2015; and the "Mini Vinnies" word mark on February 23, 2016. It filed a trademark application for "St. Vinnie's" on February 8, 2016, and the United States Patent and Trade Office issued a notice of publication with respect to that mark on June 8, 2016. However, defendant has opposed the registration of the St. Vinnie's

mark in a separate proceeding.

Plaintiff gives verbal authorization to properly established local councils and conferences in good standing to license and use its trade name, trademarks, service marks and logo upon written request, in accordance with its policies and directives. On September 2, 2006, plaintiff's national council issued a resolution providing in relevant part that "approval and authorization to use the name and or logo can only be secured through a written request and provided by a written response. Properly established Conferences and Councils are permitted to use the Society's name and logo consistent with this policy." Dkt. #55, exh. C.

The Madison Council uses the contested marks to advertise and promote its thrift store goods and services. In 2006, the Madison Council issued a press release with the title "Vinnie's to Vend Variety of Vinyl," and in 2008, it started a program called "Vinny's Lockers," which provides a safe location for people without permanent housing to secure and protect their personal items. The Madison Council's Waunakee thrift store advertises and promotes its goods and services through a Facebook page entitled "Vinnys Waunakee." In 2011, the Madison Council decided to increase its use of the St. Vinny's mark in advertising its thrift stores because members of the public already used the term and identified it with the thrift stores. It created commercials called "Let's Go Shop St. Vinny's" and "Shop St. Vinny's" that air on television and YouTube. Also in 2011, the Madison Council registered the internet domain names shopvinnies.com and shopvinnys.com, which direct users to the website svdpmadison.org. Around 2014, the Madison Council purchased and installed a

large street sign entitled "St. Vinny's Thrift Store," which is also featured on the Madison Council's website.

2.  Defendant's use of marks

Defendant began using the names "St. Vincent de Paul Community Center, Inc.," "St. Vincent de Paul's Thrift Center," "St. Vincent de Paul," "St. Vincent de Paul Store" and "St. Vincent de Paul Thrift Store" to refer to its thrift store and services in 1984 and 1985.  In 1986, it used the name "St. Vincent de Paul Society" on its donation receipts.  Defendant had the following sign on its thrift store in Plover:



In 1993, defendant published a quarterly newsletter titled "Vinnie's Newsletter."  In one of these newsletters, defendant stated:

Yes, we are much older than we look.  For example, did you know that:

**      The St. Vincent de Paul Society was organized in Paris in 1833?

**      The Society first appeared in the U.S. in St. Louis, Missouri in 1845?

*      *      *

Well, our figures have changed, our organization structure is different, but our goals have remained the same.

Dkt. #54, exh. 6.

In November 2014, defendant moved its thrift store from Plover to Stevens Point, Wisconsin, which Tom Fahl, a member of plaintiff's board of directors, viewed as a greater threat to plaintiff's marks. (Defendant disagrees with this characterization, and the parties dispute the size and scope of the Stevens Point market.) Defendant named the new store "St. Vinnies Thrift Store" and displayed signs with that name. On November 28, 2014, the Stevens Point Journal published an article about defendant's new thrift store location, stating that "[t]he local store is a part of the St. Vincent de Paul Society," a "Catholic volunteer organization dedicated to serving the poor and disadvantaged." Dkt. #55, exh. 5.

Defendant also promotes and markets its services online. From 2007 to 2015, defendant operated the website svdpplover.com and currently has the websiste stvinniesthriftstore.com and a Facebook page.

Although defendant has been aware of plaintiff's existence and the process of affiliating with plaintiff since defendant first started operating its thrift store, it never received permission from plaintiff to use these names or logos. Approximately every three months, members of the public inquire whether defendant is affiliated with plaintiff and defendant responds that it is not. However, defendant does not otherwise inform the public that it does not have an affiliation with plaintiff.

## C. Plaintiff's Interactions with Defendant

In 1984, Joe Jersey became chairman of defendant's board of directors. At that time, the community center was struggling, so Jersey approached local Catholic parishes for help, but they were all too busy. However, he and other individuals wanted to move the charity forward even without the help of the parishes because there was a need for it in the community. In 1985, Jersey sent a letter and questionnaire to several of plaintiff's conferences that operated thrift stores, stating that defendant intended to operate a thrift store "consistent with all of the objectives of the Society of St. Vincent De Paul [sic]." Dkt. #39, exh. 5. The letterhead states "St. Vincent de Paul Community Center, Inc." and is addressed to "Dear Fellow Associate, St. Vincent DePaul [sic] Society." Id. Walter Traynor, the St. Vincent de Paul Society North Central Region Extension Chairman, wrote Jersey and reminded him that he had been told to start at the conference level before opening a thrift store. (Although plaintiff insists that Traynor acted on behalf of a separate and distinct regional organization of local councils and conferences, Jersey avers that he understood the letter to be from plaintiff.)

Minutes from defendant's February 21, 1985 board meeting state that "[a]pparently, there was never a bona fide conference established but there should be one." Dkt. #51 at 41. The April 23, 1985 board meeting minutes reflect that defendant's board discussed being "able to do things typical of the St. Vincent De Paul style" and changing its operations to be similar to thrift stores affiliated with plaintiff. Id. at 39.

On December 19, 1990, two individuals from the Baraboo conference gave a

presentation to defendant's board of directors about the need for either affiliating with plaintiff or taking its sign down. (The parties dispute whether the representatives stated that they were representing the national organization or only the Baraboo conference.) The representatives stated that affiliation required a conference of at least four people, who are members of the Catholic Church, to meet every two weeks, pay annual dues of $75 to the national society (plaintiff), pay additional dues to the diocese and submit an annual report to plaintiff. Conference members were permitted to decide how to use store proceeds and would not have to turn over any proceeds to plaintiff. After the meeting, defendant decided to wait to see what plaintiff would do and never took action to affiliate with plaintiff.

In 2007, Greg Dickhut, the president of the Green Bay Council, became aware that defendant was using the St. Vincent de Paul mark and name and approached defendant about joining the national society. Dickhut told Fahl, who was a member of plaintiff's board of directors at the time, about defendant's thrift store in Plover. Fahl spoke over the telephone with Patrick McGinley, who was the president of defendant's board of directors. McGinley is now deceased, but Fahl avers that his conversation with McGinley led him to believe that defendant was working with its local Catholic parish to form a conference to affiliate with plaintiff. Fahl took no further action with respect to defendant at that time, in part because he did not perceive defendant's use of the marks in Plover as a serious threat to plaintiff's trademark rights.

In 2013, Fahl learned that defendant had never affiliated with plaintiff or stopped using the St. Vincent de Paul name. Fahl contacted Richard O'Sullivan, a member of

defendant's board of directors, to inquire about defendant's interest in affiliation. Although O'Sullivan expressed some interest in affiliation, he stated that defendant was "amenable" to changing its name but needed time to do so.

On June 14, 2013, plaintiff sent defendant a cease-and-desist letter, notifying defendant that it was infringing plaintiff's intellectual property rights and should stop using plaintiff's marks immediately. Defendant did not respond, but after one of plaintiff's board member's contacted it, O'Sullivan requested information about affiliation in April 2014. Hearing nothing further from O'Sullivan or defendant, plaintiff made additional attempts to offer defendant assistance with the affiliation process. However, defendant's board of directors never discussed forming a conference.

On November 3, 2014, after defendant opened its new store in Stevens Point, plaintiff sent defendant a second cease and desist letter. Plaintiff made continued attempts to resolve the matter and encourage defendant to seek affiliation. On June 15, 2016, plaintiff sent defendant another cease and desist letter and filed its complaint in this lawsuit. Defendant never changed its name and did not pursue an affiliation with plaintiff.

OPINION

A. <u>Lanham Act Claim</u>

The Lanham Act defines a trademark as:

> any word, name, symbol, or device, or any combination thereof [used by any person] to identify and distinguish his or her goods, including a unique product, from those manufactured and sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127. Under the Act, a party may assert claims for trademark infringement, 15 U.S.C. § 1114(1) (registered marks), or unfair competition, 15 U.S.C. § 1125(a) (common law marks and trade names). "To prevail on either claim, a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." CAE, Inc. v. Clean Air Engineering, Inc., 267 F.3d 660, 673-74 (7th Cir. 2001). See also Epic Systems Corp. v. YourCareUniverse, Inc., 244 F. Supp. 3d 878, 889 (W.D. Wis. 2017) (federal trademark infringement and unfair competition subject to same standard); Box Acquisitions, LLC v. Box Packaging Products, LLC, 32 F. Supp. 3d 927, 934 (N.D. Ill. 2014) ("Both of Plaintiff's federal trademark infringement and unfair competition claims involve the same elements and proof.").

For the reasons explained below, I agree that plaintiff has failed to adduce sufficient evidence to prove as a matter of law that any of its claimed marks are protectable under the first element of its Lanham Act claim. Because I am denying plaintiff's motion for summary judgment on this ground, it is unnecessary to discuss the parties' arguments with respect to the second element related to likelihood of confusion. Sorensen v. WD-40 Co., 792 F.3d 712, 726 (7th Cir. 2015) (setting forth seven-factor test for likelihood of confusion, which typically is question of fact).

Determining whether a party has established protectable rights in a trademark is made on a case by case basis, considering the totality of the circumstances. Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 433 (7th Cir. 1999) (citing New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1200 (9th Cir. 1979)). The party seeking

to establish a trademark must show that it adopted the mark and "use[d it] in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark]." Id. at 433-34. "The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it." Id. at 434 (citing Zazú Designs v. L'Oreal, S.A., 979 F.2d 499, 503-04 (7th Cir. 1992)). "Use" may be demonstrated through a wide variety of sources, including "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications, as well as in media outlets such as television and radio." Id.

Although registration of a mark with the United States Patent and Trademark Office provides the owner certain benefits, trademark ownership is not acquired by federal or state registration but rather from "prior appropriation and actual use in the market." S.C. Johnson & Son, Inc. v. Nutraceutical Corp., 835 F.3d 660, 665 (7th Cir. 2016) (citing Allard Enterprises, Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350, 356 (6th Cir. 1998)). See also Blastoff, 188 F.3d at 435 ("[A] trademark application is always subject to previously established common law trademark rights of another party."); Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512-13 (11th Cir. 1984) ("The use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source."). However, only those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently "distinctive,"

are eligible for federal registration or protection as common law marks under the Lanham Act. 15 U.S.C. § 1052(e)-(f); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); Tana v. Dantanna's, 611 F.3d 767, 773-74 (11th Cir. 2010).

"The law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful." Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001) (citing Two Pesos, 505 U.S. at 768; Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976) (Friendly, J.)). Generic terms are those commonly used to name a type or kind of good. Mil-Mar Shoe Co. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir. 1996); Timelines, Inc. v. Facebook, Inc., 938 F. Supp. 2d 781, 791 (N.D. Ill. 2013) (internal citations omitted). See, e.g., Hickory Farms, Inc. v. Snackmasters, Inc., 500 F. Supp. 2d 789, 795 (N.D. Ill. 2007) ("beef stick" and "turkey stick" are generic terms). A descriptive term "describes the ingredients, qualities, or characteristics of an article of trade or a service." Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 727 (7th Cir. 1998) (citing Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir. 1986)). A suggestive mark indirectly suggests a product's qualities. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 952-53 (7th Cir. 1992). The distinction between these "mark classifications" is important because suggestive, arbitrary and fanciful marks are deemed inherently distinctive. Mil-Mar, 75 F.3d at 1156. However, generic terms receive no trademark protection, and descriptive marks are not protected unless they become distinctive by acquiring "secondary meaning 'in the collective consciousness of the relevant

community.'" Platinum Home Mortgage, 149 F.3d at 727 (quoting Mil-Mar, 75 F.3d at 1157).

If a mark is registered, the Act provides a plaintiff one of two presumptions as of the filing date: (1) that the registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning. S.C. Johnson & Son, 835 F.3d at 665. However, "[w]hen the identifying word, term, name, symbol or device claimed as a trade name or mark is not registered . . ., the burden is on the claimant . . . to establish that it is entitled to protection under [the] Act." Platinum Home Mortgage, 149 F.3d at 727.

Plaintiff contends that as early as 1845, it starting using "St. Vincent de Paul Society" and "Society of St. Vincent de Paul" to promote and market its goods and services. Plaintiff also contends that it and members of the public began referring to the society by the abbreviations or nicknames of "St. Vinnie's," "St. Vinnies," "St. Vinny's," "Vinnies" and "SVDP" by the 1940s and that it has used those marks to promote its goods and services, including its thrift store services, since that time. Blastoff, 188 F.3d at 434 ("[P]arties have been found to possess rights in an alteration of an existing mark that was used solely by third parties to designate its product."). Although plaintiff has registered a few versions of these marks, the presumption of validity is not dispositive in this case because plaintiff did not obtain its first trademark registration until 1999, well after defendant began using the name "St. Vincent de Paul Community Center, Inc." and other variations of that name in 1984 and 1985. (Defendant did not use the abbreviation "St. Vinnie's" until almost 10 years later, but that particular mark is discussed further below.) Therefore, to show that it has a

protectable trademark with rights superior to defendant's, plaintiff must show that it adopted sufficiently distinctive marks before defendant started using them and continued to use them in a "sufficiently public" way to identify or distinguish its goods and services.

Plaintiff has submitted a variety of evidence in support of its contention that its marks are protectable and that it acquired superior rights to those marks, including declarations from long-time volunteers and employees, corporate records (articles of incorporation and internal newsletters), newspaper articles, online advertising and other publicly-available documents. In its response to plaintiff's motion and proposed findings of fact, defendant generally questions the admissibility and relevancy of some of plaintiff's evidence, argues that plaintiff's trademarks are unprotectable generic marks, challenges plaintiff's alleged use of the marks in conjunction with thrift stores and argues that defendant's use of the contested marks is an appropriate fair use of a descriptive term. For the most part, defendant has not developed its arguments in any meaningful way, failing to support them with admissible evidence or relevant legal authority. However, as discussed below, plaintiff has not adduced sufficient evidence to warrant judgment in its favor regarding the length and extent of its use of the claimed marks and whether the marks were distinctive before registering them.

1. Local council and conference licenses

In an initial argument, defendant challenges plaintiff's claimed use of "St. Vinnie's" and other marks in conjunction with thrift stores on the ground that the local conferences

and councils, and not plaintiff, operate the thrift stores. However, as plaintiff points out:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055. A licensee is a related company if the license is valid. Letica Corp. v. Sweetheart Cup Co., 805 F. Supp. 482, 487 (E.D. Mich. 1992) (citing Visa, U.S.A., Inc. v. Birmingham Trust National Bank, 696 F.2d 1371, 1377 n.4 (Fed. Cir. 1982); 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 18:16B at 837).

Noting that plaintiff has only oral license agreements with the local conferences and councils, defendant states generally that "it is not clear by what legal mechanism the conferences' use of the mark inures back to the benefit of the plaintiff for common law purposes." Dkt. #67 at 5. However, the fact that a license is not written does not in itself make the license invalid. Oreck Corp. v. Thomson Consumer Electronics, Inc., 796 F. Supp. 1152, 1162 n.10 (S.D. Ind. 1992) (license may be oral); Leticia Corp., 805 F. Supp at 487; 3 McCarthy on Trademarks and Unfair Competition § 18:43 (5th ed.). Because defendant has not adduced any evidence or cited any legal authority to support its suggestion that plaintiff does not have valid licenses with the local conferences and councils, I will not consider this issue further. Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); Campania

16

Management Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, 852 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived.").

2. Plaintiff's adoption and use of marks

In support of its contentions that it has regularly used variations of the St. Vincent de Paul Society mark nationwide since the early 1900s, plaintiff relies primarily on the declarations of Thomas Fahl, a long-term volunteer and current member of plaintiff's board of directors, dkt. #55; Ernie Stetenfeld, the current chief executive officer and executive director of the Madison Council in Wisconsin, dkt. #56; and Ralph Middlecamp, a volunteer and former chief executive officer and executive director of the Madison Council, dkt. #57. In response to plaintiff's proposed findings of fact on this issue, defendant makes general "hearsay" and "lack of foundation" objections. Although defendant's arguments are not well developed, they are valid.

The declarations of Stetenfeld, Fahl and Middlecamp include vague and conclusory statements such as: "SVDP Society has continuously since 1845 used, directly and through its licensees, certain trade names, trademarks and service marks, and promoted and marketed its services and goods under a number of common law and/or federally registered marks," Decl. of Fahl, dkt. #55 at 14; "[t]he Madison Council has continuously promoted and marketed thrift store goods and services under the marks ST. VINCENT DE PAUL SOCIETY, ST. VINCENT DE PAUL, and ST. VINCENT DE PAUL STORE, as well as the mark ST. VINNY'S, since at least as early as the 1950s," Decl. of Middlecamp, dkt. #57 at

¶ 12; and "[t]he Madison Council opened its first thrift store in 1942 and since then has continuously promoted and marketed that store's services under the marks ST. VINCENT DE PAUL SOCIETY, ST. VINCENT DE PAUL, ST. VINCENT DE PAUL STORE, and ST. VINNY'S," Decl. of Stetenfeld, dkt. #56 at ¶ 6. Such statements lack foundation and have minimal evidentiary value.

It is not reasonable to infer that Fahl, Stetenfeld or Middlecamp had personal knowledge of plaintiff's use of trademarks since the late 1800s or early 1900s. According to their declarations, Middlecamp first began volunteering with the Madison Council in 1985, dkt. #57 at ¶ 5, and Stetenfeld became a volunteer with the same council in 1991, dkt. #56 at ¶ 3, so any knowledge they acquired about plaintiff's use of marks post-dates defendant's first use of the marks in 1984 and 1985. Even though Stetenfeld and Middlecamp aver that they were residents of the local community in the 1980s and referred to the Madison Council's thrift stores as "St. Vinny's" at that time, dkt. #56 at ¶ 9 and #57 at ¶ 16, it is not reasonable to conclude from that fact alone that they had knowledge of plaintiff's nationwide operations and marketing. The same is true of Fahl, who was a volunteer with plaintiff in the 1970s but did not take on a wider role in plaintiff's operations until he became a regional vice president in 2005. Dkt. #55 at ¶¶ 4, 8-9. Additionally, a few conclusory statements that plaintiff has "used" certain marks for a certain period of time is not sufficient to establish ownership of a nationwide trademark as a matter of law.

In his declaration, Middlecamp refers to a book titled Humble Harvest, which purports to describe the history of the society in the Milwaukee Archdiocese from 1849 to

1949, dkt. #57 at ¶ 8, but Middlecamp says very little about it. He attaches to his declaration a few photographs from the book that depict the front windows of thrift stores imprinted with the name "St. Vincent de Paul Society," but the photographs are not dated and the location of some of the stores is not clear. Id., exh. A. Although the photographs provide some evidence that thrift stores throughout Wisconsin used the mark "St. Vincent de Paul Society" in the past, it is not clear from the excerpts provided by plaintiff exactly when or how long these stores operated or to what extent they used the mark.

Similarly, Stetenfeld attaches to his declaration a copy of a photograph of a mural from the 1970s that he states contains the term "St. Vinnies" and depicts plaintiff's thrift store fashion show, but none of this is clear from the copy of the photograph. Dkt. #56, exh. D. The other newspaper articles, websites and letters to the editor attached to his declaration all post-date defendant's first use of the contested marks. Id., exhs. A-C and E-J.

Finally, with respect to the "St. Vinnie's" mark in particular, plaintiff submits more recent articles, advertising and corporate records—all dated after approximately 2006—that seem to provide stronger evidence that plaintiff used and was commonly known by that mark or marks with slightly varied spellings. However, the evidence is not conclusive. Even though defendant did not change the name of its store to "St. Vinnie's Thrift Store" until 2014, there is some evidence that defendant used the term "Vinnies" in its quarterly newsletter as early as 1993.

In sum, plaintiff's motion for summary judgment must be denied because plaintiff has failed to show with certainty whether it adopted each of its claimed marks and used them

in a "sufficiently public" manner to identify its services before defendant began using allegedly similar marks.

3. Classification of marks

Plaintiff has the burden of showing that its claimed marks are distinctive, meaning that they distinguish plaintiff's goods and services in the mind of an appropriate segment of the public. Although plaintiff says that it offers in-home charitable services and organizes volunteer programs and community service projects, the good or service discussed by the parties are the St. Vincent de Paul (or St. Vinnies) thrift stores operated by plaintiff's affiliates to raise money for charity. Defendant also operates such a store using the names St. Vincent de Paul and St. Vinnies. In order to be protected, plaintiff's claimed mark must be either inherently distinctive because it is suggestive or have achieved secondary meaning as a descriptive term. Although plaintiff is entitled to a presumption that the marks it has registered (e.g., "Society of St. Vincent de Paul") are distinctive as of the filing date of the registration, plaintiff did not register its first mark (a design mark) until 1999. Therefore, plaintiff retains the burden of showing that its claimed marks were distinctive prior to that time.

Plaintiff contends that the name "St. Vincent de Paul" is "suggestive" and not merely descriptive because it does not directly describe the content or characteristics of a thrift store but rather suggests that the thrift store is charitable in nature because St. Vincent de Paul is the patron saint of charity. G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d

20

985 (7th Cir. 1989) (A suggestive term "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods."); C & N Corp. v. Kane, 953 F. Supp. 2d 903, 914 (E.D. Wis. 2013) (finding "HALLOWINE" does not directly describe wine or its ingredients but suggests that wine is spiced, autumnal beverage.).

Defendant has not refuted this argument directly or otherwise discussed whether the contested marks are descriptive rather than suggestive.  Rather, in a conclusory argument, defendant contends that plaintiff's marks are unprotectable "generic" terms because "St. Vincent de Paul" is the name of a saint used by many charitable and religious organizations, such as the "Sisters of Charity of St. Vincent de Paul" and the "Daughters of Charity of St. Vincent de Paul."  (Defendant also identifies one organization in Texas that does charity work, but that organization posts a conspicuous disclaimer that it is not affiliated with plaintiff.)  To the extent that defendant is arguing that the names of religious institutions and sects are not protectable as trademarks or as part of trademarks, it is incorrect.  The National Spiritual Assembly of the Baha'is of the United States, 2015 WL 9913823, at *3 (TTAB Sept. 1, 2015) (rejecting petitioner's argument that religious terms cannot be registered because religious terms must be available for public use).  Moreover, defendant has not made a convincing argument that the name "St. Vincent de Paul" should be considered generic rather than descriptive or suggestive.

As plaintiff points out, the name "St. Vincent de Paul" is not synonymous with a type or kind of good that courts have found to be generic, like the terms "church," "sandwich" or

"beef stick." TE-TA-MA Truth Foundation—Family of URI, Inc. v. World Church of Creator, 297 F.3d 662, 666 (7th Cir. 2002); Hickory Farms, 500 F. Supp. 2d at 795. The Court of Appeals for the Seventh Circuit has held that "[s]ignificant use of a term by competitors in the industry has traditionally been recognized, along with dictionary evidence, as indicating genericness." Mil-Mar, 75 F.3d at 1159. However, apart from identifying a few charitable organizations using the name St. Vincent de Paul, defendant has not adduced any persuasive evidence showing that "St. Vincent de Paul" is a term understood by the public to refer to charitable thrift stores in general. In addition, "St. Vincent de Paul" is not a term defined in the dictionary but rather the name of a well-known individual who was venerated as a saint. E.g., www.merriam-webster.com/dictionary/Vincent de Paul (accessed December 20, 2017).

Although I agree that defendant has not adduced sufficient evidence to rebut the presumption that plaintiff's registered marks are distinctive as of the filing date of registration, I am not persuaded that plaintiff has met its burden with respect to the classification of its marks before that time. The line between descriptive and suggestive is not clear in this case. Box Packaging Products, LLC v. Acquisitions Packaging Products, LLC, 32 F. Supp. 3d 927, 934 (N.D. Ill. 2014) ("classification of plaintiff's marks is question of fact). Courts use the "degree of imagination test" to determine whether a mark is descriptive or suggestive: "[I]f the mark imparts information directly, it is descriptive, however if the mark stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." Sands, 978 F.2d at 952 (identifying "Thirst Aid"

as descriptive when used for a drink that quenches thirst and "Roach Motel" as suggestive when used for an insect trap).  Under this test, it appears that St. Vincent de Paul is more suggestive of charitable services than descriptive of a thrift store.  However, a point that plaintiff fails to raise is that many courts and treatises consider personal names as a subset of descriptive marks.  Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 988 (7th Cir. 2004) (collecting cases).  See also Tana, 611 F.3d at 774 ("Names—both surnames and first names—are regarded as descriptive terms and therefore one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning.").  In fact, the Lanham Act states that a mark that is "primarily merely a surname" is not registrable in the absence of secondary meaning.  15 U.S.C. § 1052(e).

The Court of Appeals for the Seventh Circuit has explained that the general purpose of the rule is to prevent a person from using his own name in his own business, raising concerns that granting a monopoly on a name deprives the consuming public of valuable information about particular goods or services.  Peaceable Planet, 362 F.3d at 988-89; Bobak Sausage Co. v. A & J Seven Bridges, Inc., 805 F. Supp. 2d 503, 518 (N.D. Ill. 2011).  However, the court of appeals has made clear that this rule is not to be universally applied, especially when dealing with marks based on first names.  Peaceable Planet, 362 F.3d at 989-90.  Because St. Vincent de Paul includes the full name and title of an individual, the rule does not necessarily apply.

In cases like this one, in which the claimed mark is not limited to a surname, a court should examine the rationale of the general rule classifying surname-based marks as

descriptive and determine whether it applies. Id. at 990 ("When none of the purposes that animate the 'personal name' rule is present, and application of the 'rule' would impede rather than promote competition and consumer welfare, an exception should be recognized."). Specifically, classifying marks as descriptive may not be appropriate in cases in which: (1) limiting use of the mark does not prevent the defendant from going into business under his own name; (2) the name upon which the mark is based is not common; and (3) preventing the defendant from using the mark would not deprive the public of valuable information. Id. Further, where alternative names are readily available, marks based on surnames or first names might be more appropriately categorized as suggestive marks and thus considered inherently distinctive. Bobak, 805 F. Supp. 2d at 518 (citing id. at 991; Eva's Bridal Ltd. v. Halanick Enterprises, Inc., 2010 WL 2035720, at *3-4 (N.D. Ill. May 19, 2010)).

The first factor is not applicable in this case because St. Vincent de Paul has been deceased for hundreds of years, but the name is not necessarily uncommon, as evidenced in part by the religious groups that use it. Although one would think that there are alternative names for defendant's thrift store, defendant at least makes the argument that preventing it from using the mark would deprive the public of valuable information about the charitable nature of its services. In sum, without more information from the parties on this issue, I cannot find that there is no doubt that plaintiff's marks should be classified as suggestive.

Further, if plaintiff's marks must be considered descriptive, plaintiff must show that they achieved secondary meaning with respect to its thrift stores during the relevant time

period. "A court may consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." Platinum, 149 F.3d at 728 (citing International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1085 (7th Cir. 1988)). Other factors include "place in the market and evidence of intentional copying." Packman, 267 F.3d at 641. Although plaintiff has adduced some evidence related to this issue, it has not made this showing with any certainty, particularly with respect to its use of the marks prior to the early 2000s. As discussed at length above, plaintiff has not clearly identified its place in the market or the length and manner of its use of the marks during the entire period at issue in this case. Accordingly, plaintiff has not shown as a matter of law that its marks were either suggestive or had achieved secondary meaning as descriptive terms prior to their registration.

### B.  Classic Fair Use Defense

Defendant contends that it is not trying to pass itself off as one of plaintiff's affiliates and has used the "St. Vincent de Paul" name and variations on that name fairly to describe its charity work. Defendant's argument invokes the affirmative defense of "fair use," which requires defendant to show that (1) it is not using the term as a mark; (2) the term is descriptive of its goods or services; and (3) it used the term "fairly and in good faith" only to describe its goods or services. Packman, 267 F.3d at 639 (quoting 15 U.S.C. § 1115(b)(4)). Determining whether a defendant's use was a non-trademark use in good faith

is a question of fact, but "these issues may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" Packman, 267 F.3d at 637 (quoting Door Systems, Inc. v. Pro-Line Door Systems, Inc., 83 F.3d 169, 171 (7th Cir. 1996)).

Plaintiff has presented some strong evidence related to defendant's use of St. Vincent de Paul and St. Vinnies as marks and defendant's intent to use the terms to imply an affiliation with plaintiff. However, for the reasons discussed in conjunction with whether the marks should be classified as suggestive or descriptive, I cannot say there is no doubt about whether the term is merely descriptive of defendant's goods and services. The Court of Appeals for the Seventh Circuit has explained that the fair use defense "'is based on the principle that no one should be able to appropriate descriptive language through trademark registration.'" Packman, 267 F.3d at 639 (quoting Sands, 978 F.2d at 951). Accordingly, plaintiff's motion for summary judgment with respect to defendant's fair use of the contested marks must be denied.

### C. Laches Defense

"The doctrine of laches is derived from the maxim that those who sleep on their rights lose them." Wisconsin Cheese Group, Inc. v. V & V Supremo Foods, Inc., 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008) (citing Chattanoga Manufacturing, Inc. v. Nike, Inc., 301 F.3d 789, 792 (7th Cir. 2002)). Fundamentally, the concept of laches concerns whether it is fair for the plaintiff to assert a legal claim. American Dairy Queen Corp. v. Universal Investment

Corp., No. 16-cv-323, 2017 WL 3701865, at *9 (W.D. Wis. Aug. 25, 2017).  A defendant asserting that laches applies in a trademark infringement case must demonstrate that (1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark; (2) the plaintiff inexcusably delayed taking action with respect to the defendant's use; and (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time.  Id. (citing Chattanoga Manufacturing, 301 F.3d at 792-93).  With respect to prejudice, the Court of Appeals for the Seventh Circuit has explained:

> A delay prejudices a defendant when the assertion of a claim available for some time would be inequitable in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.  See Hot Wax, 191 F.3d at 824. We have previously noted that "laches is a question of degree" and that "if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice is required."  Id.  Prejudice may be shown if the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment and build up a valuable business around its trademark.

Chattanoga Manufacturing, 301 F.3d at 795.

Typically, the doctrine of laches bars recovery of damages, including wrongfully derived profits, during the time prior to filing suit.  Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 824 n.3 (7th Cir. 1999).  "Upon a showing of infringement, however, the plaintiff may still be entitled to injunctive relief, and to damages and profits for the period subsequent to the filing of suit."  James Burrough Ltd. v. Sign of Beefeater, Inc., 572 F.2d 574, 578 (7th Cir. 1978) (citing McLean v. Fleming, 96 U.S. 245 (1877)).  In some cases, however, "the delay may be so prolonged and inexcusable that it would be inequitable to

permit the plaintiff to seek injunctive relief as to future activities." Wisconsin Cheese Group, 537 F. Supp. 2d at 1005 (quoting Seven-Up Co. v. O-So-Grape, Co., 283 F.2d 103, 106 (7th Cir. 1960)). See also Hot Wax, 101 F.3d at 824 n.3 (acknowledging that lachesmay not may not bar injunctive relief, but affirming district court's finding that delay was so thatnjunctive relief was also barred); Prestwick Group, Inc. v. Landmark Studio Ltd., No. 14-cv-731, 2015 WL 2384191, at *10 (E.D. Wis. May 19, 2015) (finding that "it would be inequitable to permit Prestwick to seek injunctive relief on its trade dress claims" in light of 12-year delay in filing suit).

The Court of Appeals for the Seventh Circuit has explained that "the doctrine of laches plays a more important role [with respect to the Lanham Act] than it otherwise might because the Act does not contain a statute of limitations on trademark infringement claims." Chattanoga Manufacturing, 301 F.3d at 793. Courts are directed to look to "analogous state statutes of limitations," id. at 793, and "[o]nce [the] relevant state limitations period has run, an allegedly infringing party is entitled to a presumption that the doctrine of laches applies." Wisconsin Cheese Group, 537 F. Supp. 2d at 1000. In this case, the parties both identify § 100.18(11)(b)(3) of the Wisconsin Deceptive Trade Practices Act as an analogous state statute, pointing out that statute imposes a three-year limitations period. Wis. Stat. § 100.18(11)(b)(3).

The parties dispute when plaintiff should have had constructive knowledge of defendant's thrift store and its use of the claimed marks. However, plaintiff concedes that it learned of defendant's alleged infringement in 2007, seven years before it sent defendant

a cease and desist letter and more than 10 years before it filed this lawsuit. Therefore, defendant is entitled to a presumption that laches applies, and "[t]o rebut the presumption, [plaintiff] must offer evidence excusing its delay or demonstrating that [defendant] has not suffered prejudice." Wisconsin Cheese Group, 537 F. Supp. 2d at 1000 (citing A.C. Aukerman Co. v. Miller Formless Co., 693 F.2d 697, 699 (7th Cir. 1982)).

Plaintiff offers reasons for its delay and argues that defendant has not suffered prejudice. For example, plaintiff contends that it did not immediately sue defendant in 2007 because (1) it did not believe that defendant's use of the mark in the small town of Plover, Wisconsin, posed a serious threat to its trademark rights; and (2) it understood from a now deceased member of defendant's board of directors that defendant would obtain a formal affiliation with plaintiff or gradually phase out the use of the mark. According to plaintiff, when it learned in 2013 that defendant had continued to use the mark without seeking an affiliation, it sent its first cease and desist letter, which sparked prolonged discussions about a possible amicable resolution. Relying on the doctrine of progressive encroachment, plaintiff argues that it sued defendant as soon as the parties' negotiations fell apart because defendant materially altered its infringement by relocating its store in what plaintiff considered a higher profile and larger market in 2014. Prestwick Group, Inc. v. Landmark Studio Ltd., 2015 WL 2384191, at *6 (E.D. Wis. May 19, 2015) (setting forth elements of progressive encroachment as defense to laches). Finally, plaintiff argues that defendant's claim of prejudice is based on the fact that it built goodwill and a reputation by promoting what it knew to be plaintiff's mark. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609,

615 (7th Cir. 1965) ("If . . . prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay."); Warner-Lambert Co. v. Schick U.S.A., Inc., 920 F. Supp. 278, 290 (D. Conn. 1996) (mere continuation of spending money to advertise infringing mark over eight-year period does not constitute "prejudice" sufficient to prove laches defense). Because a reasonable jury could conclude from plaintiff's version of events that its delay in filing suit was excusable and that defendant does not have a valid claim of prejudice, I will deny defendant's motion for summary judgment. However, I do not find plaintiff's arguments so compelling as to warrant the entry of judgment as a matter of law in its favor.

In its motion for summary judgment with respect to laches, plaintiff correctly points out that even in cases in which laches applies, the law allows the senior user's claim to be revived from estoppel if the senior user can show that "inevitable confusion" would result from dual use of the marks. TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 886 (7th Cir. 1997) (citing SunAmerica Corp. v. SunLife Assurance Co. of Canada, 77 F.3d 1325, 1334 (11th Cir. 2010); Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc., 934 F.2d 1551, 1564 (11th Cir. 1991)). "Inevitable confusion" is "an increment higher than that required for a finding of likelihood of confusion." SunAmerica II, 77 F.3d at 1334 n.3. However, as discussed above, the likelihood of confusion element of plaintiff's infringement claim depends on disputed issues of fact that must be resolved at trial.

Plaintiff also argues that laches will not bar an injunction against an intentional

infringer.  Precision Instrument Manufacturing Co. v. Automotive Maintenance Machine Co., 324 U.S. 806, 814 (1945) (unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"); Hermes, International v. Ledere de Paris Fifth Avenue, Inc., 219 F.3d 104, 107 (2d Cir. 2000) ("[L]aches is not a defense against injunctive relief when the defendant intended the infringement.") (internal quotation omitted); Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 825 (7th Cir. 1999) ("A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances.").  Although I agree that there is some legal authority for plaintiff's position, whether, to what extent and with what intent defendant infringed any of plaintiff's claimed marks are disputed issues of fact that must be resolved trial.  Accordingly, plaintiff's motion for summary judgment with respect to defendant's laches defense also will be denied.

D.  Other Affirmative Defenses

Plaintiff contends that defendant asserts the additional affirmative defenses of acquiescence, waiver, equitable estoppel and abandonment in only a conclusory manner and cannot carry its burden of proof on any of them.  Defendant says very little in response, identifying the legal standards only with respect to estoppel and waiver and not discussing abandonment or acquiescence at all.  Defendant's only argument in support of this affirmative defense seems to be that plaintiff "sat on its hands for 33 years" and failed to police its trademarks.  Dkt. #60 at 12.

31

In addition, plaintiff notes that defendant also listed "generic mark," "goods in trade/merely descriptive" and "no designation of origin" as affirmative defenses in its amended answer, dkt. #23 at ¶¶ 43, 50 and 53, but to the extent that defendant discusses these issues at all, it is in conjunction with its objections to plaintiff's claims that its marks are protectable. Accordingly, I have considered these "defenses" as challenges to the protectability of plaintiff's marks, as discussed above.

For the reasons explained below, I find that plaintiff is entitled to summary judgment with respect to defendant's affirmative defenses of acquiescence, waiver, equitable estoppel and abandonment.

1. Estoppel

"There are four elements of equitable estoppel: (1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." Affordable Erecting, Inc. v. Neosho Trompler, Inc., 2006 WI 67, ¶ 33, 291 Wis. 2d 259, 275, 715 N.W.2d 620, 628. See also Chi-Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1228 (7th Cir. 1991) ("For estoppel to apply in a copyright action, the copyright owner must be aware of the infringing conduct and yet act in a way that induces the infringer reasonably to rely upon such action to his detriment."). However, "silence alone is not enough to constitute misleading conduct" and "may constitute misleading conduct . . . only when it is combined with 'other facts respecting the relationship or communication between

the parties to give rise to a necessary inference' that the plaintiff would not enforce its rights." Top Tobacco, L.P. v. Good Times USA, LLC, 2017 WL 395698, at *4 (N.D. Ill. Jan. 30, 2017) (quoting R2 Medical Systems, Inc. v. Katecho, Inc., 931 F. Supp. 1397, 1416 (N.D. Ill. 1996)).

Apart from its limited argument that plaintiff told defendant to stop using its marks and then said nothing for many years, defendant has not alleged a "relationship or communication between the parties giving rise to a necessary inference" that plaintiff would not enforce its rights. In particular, it has not adduced evidence of any misleading statement or action on plaintiff's part. Chi-Boy Music, 930 F.2d at 1229 (holding that estoppel was inapplicable because "[a]lthough [plaintiff] may not have sued [defendant] immediately after the policy change [giving rise to the copyright action at issue], it certainly undertook no action that [defendant] reasonably could have misconstrued"). Further, defendant's reliance on plaintiff's silence was not reasonable, as there is no evidence that plaintiff said or did anything to suggest that it intended to authorize defendant's use of the marks. Accordingly, defendant cannot satisfy its burden of proof with respect to the affirmative defense of equitable estoppel.

## 2. Acquiescence, abandonment and waiver

These three defenses raise similar issues with respect to how plaintiff has used and protected its claimed marks, and defendant seems to confuse them in its brief. Further, although defendant identifies Wisconsin's general definition of waiver, it does not discuss

the affirmative defenses of acquiescence or abandonment at all, arguing only generally throughout its brief that plaintiff did not police its trademarks in a meaningful way and let more than 30 years pass before taking any action against defendant.

a. Abandonment

To establish abandonment of a trademark, defendant must prove that the mark's "use has been discontinued with intent not to resume such use." Kane, 953 F. Supp. 2d at 912 (quoting Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 955 (7th Cir.1992)). Defendant has not adduced any evidence showing that this is what plaintiff was doing in this case. Rather, defendant implies that plaintiff did not exercise sufficient control over the use of the marks by the local councils and conferences and accuses plaintiff of not protecting its marks from potential infringers.

Although a trademark owner can abandon its trademark rights through uncontrolled or "naked" licensing by allowing its licensees to "depart from [the owner's] quality standards," "absent a significant deviation from [such] standards, a licensor does not forfeit its trademark rights through licensing agreements." TMT North America, 124 F.3d at 885-86 (noting that naked licensing causes trademark to lose its utility as an informational device" and misleads public). See also Oberlin v. Marlin American Corp., 596 F.2d 1322, 1327 (7th Cir. 1979) ("The licensor must control the operations of its licensees to ensure that the trademark is not used to deceive the public as to the quality of the goods or services bearing the name," but "[t]he duty does not give a licensor control over the day-to-day

operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question.").  "The sort of supervision required for a trademark license is the sort that produces consistent quality."  <u>Eva's Bridal Ltd. v. Halanick Enterprises, Inc.</u>, 639 F.3d 788, 790 (7th Cir. 2011) (finding naked licensing because trademark owner made no attempt to control quality of bridal retail shop licensing mark).  However, "[b]ecause a finding of inadequate control can result in a forfeiture of trademark rights, courts impose a heavy burden on the person asserting a lack of reasonable control by a licensor." (<u>Restatement (Third) of Unfair Competition</u> § 33 (1995).  Defendant has failed to meet that burden by not adducing any evidence of plaintiff's failure to control the quality of the services provided by the local councils and conferences or any evidence that the licensees failed to offer consistent services or otherwise departed from plaintiff's standards or requirements.  <u>Id.</u> ("Any evidence relating to the likelihood that the quality of the licensee's goods or services will depart from the standards imposed or anticipated by the owner of the trademark is relevant in determining the adequacy of the licensor's control.").

Defendant argues that plaintiff does not have strong marks and suggests that plaintiff has abandoned its marks because it does not have a rigorous system of "policing" them, relying on its affiliates to discover potential infringers by "accident."  To the extent that defendant is challenging plaintiff's failure to sue defendant for more than 30 years, it is raising the defense of laches.  3 <u>McCarthy on Trademarks and Unfair Competition</u> § 17:17 (5th ed.) ("Laches or acquiescence is a personal defense, while abandonment is a loss of rights as against the whole world.").  Some courts have found abandonment when a

trademark owner has failed to sue infringers for so long that the mark has been used by competitors and customers as the generic name of an article or as a descriptive term such that the mark no longer indicates origin in one seller.  Id.  However, as discussed above, defendant has introduced no evidence that plaintiff's claimed marks are either generic or descriptive.  At most, defendant's arguments regarding plaintiff's failure to prosecute others are  relevant to the strength or distinctiveness of plaintiff's mark, which is one factor the jury will have to consider in determining the likelihood of confusion between plaintiff's and defendant's products and services.  Id.; Sorensen v. 40-WD Co. v.792 F.3d 712, 726 (7th Cir. 2015) (identifying factors that must be proven to show likelihood of confusion element of Lanham Act claim).  Thus,  I conclude that defendant has not shown that plaintiff abandoned its marks.

b.  acquiescence

"[A]cquiescence is an equitable doctrine that permits the court to deny relief in an action for trademark infringement if the evidence shows that the owner of the mark has, through his words or conduct, conveyed his consent to the defendant's use of the mark."  Hyson USA, Inc. v. Hyson 2U, Ltd., 821 F.3d 935, 940 (7th Cir. 2016).  The Court of Appeals for the Seventh Circuit has made it clear that acquiescence "requires an 'affirmative word or deed' that conveys the trademark owner's implied consent to the junior user's use of his marks."  Id. at 940.  Unlike laches, acquiescence requires more than a showing that the party seeking to enforce its trademark rights has unreasonably delayed pursuing

litigation.  Id. (citing Creative Gifts, Inc. v. UFO, 235 F.3d 540, 548 (10th Cir. 2000)).

Defendant has made no attempt to show any affirmative act or deed on plaintiff's part that implying that plaintiff was consenting to defendant's use of the marks.  In fact, the undisputed facts show that plaintiff's only affirmative communications with defendant conveyed its disapproval of defendant's use of the contested marks.

c.  waiver

Defendant points out that the Wisconsin Supreme Court has defined waiver as the voluntary and intentional relinquishment of a known right, Milas v. Labor Association of Wisconsin, Inc., 214 Wis. 2d 1, 9-10, 571 N.W.2d 656, 659 (1997), and does not require the party alleging waiver to "prove that the party had an actual intent to waive;" waiver "may be inferred as a matter of law from the conduct of the parties."  However, defendant has not cited any authority supporting the use of the defense in the trademark context, and it is not clear that there is any such authority.  As plaintiff argues, 15 U.S.C. § 1115(b)(9) lists laches, estoppel and acquiescence as available equitable defenses to trademark infringement, but the statute does not list waiver.  Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp., 2010 WL 2662720, at *11 (N.D. Ga. June 30, 2010) (noting same).  The Court of Appeals for the Eleventh Circuit has noted, albeit in dicta, that waiver "has no trademark roots."  SunAmerica v. SunLife Insurance Co. of Canada, 77 F.3d at 1344 n.7. See also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC, 703 F. Supp.2d 1307,(S.D. Fla. Mar.18, 2010) ("Since, the waiver defense has no root in trademark law, I will not

address that defense in this order."). It does not appear that the Court of Appeals for the Seventh Circuit has addressed the issue.

In any event, even if waiver is a defense to a claim of trademark infringement, it is "more difficult to prove than either laches or acquiescence, as it involves not sleeping on one's rights but intentionally relinquishing them." RE/MAX International, Inc. v. Trendsetter Realty, LLC, 655 F. Supp. 2d 679, 719 (S.D. Tex. 2009) (discussing waiver in trademark case, acknowledging that it was unclear whether Fifth Circuit recognized it as defense). Defendant's allegations about plaintiff's "haphazardly policing its supposed intellectual property" and "delegating decision making authority" to local councils and conferences, dkt. #67 at 13-14, fail to show waiver for the same reasons that they fail to show acquiescence or abandonment. Although defendant also points out that plaintiff failed to register its marks until the 2000s, trademark rights derive from use and not registration. S.C. Johnson, 835 F.3d at 665.

In sum, defendant has failed to offer sufficient evidence to allow a reasonable jury to find in its favor on the affirmative defenses of acquiescence, waiver, equitable estoppel and abandonment. Accordingly, plaintiff's motion for summary judgment with respect to these affirmative defenses will be granted.

### D. Unjust Enrichment Counterclaim

The parties agree that defendant must prove three elements if it is to establish a claim for unjust enrichment in this case: (1) the plaintiff conferred a benefit upon the defendant;

(2) the defendant had an appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. Lindquist Ford, Inc. v. Middleton Motors, Inc., 557 F.3d 469, 477 (7th Cir. 2009); Don-Rick, Inc. v. QBE Americas, 995 F. Supp. 2d 863, 873-74 (W.D. Wis. 2014) (quoting Buckett v. Jante, 2009 WI App 55, ¶ 10, 316 Wis. 2d 804, 767 N.W.2d 376). In response to plaintiff's argument that defendant cannot show that it conferred any benefit on plaintiff or that plaintiff retained any benefit under inequitable circumstances, defendant states only the following:

> A jury could find that a benefit was created by the massive creation of good will and bluesky associated with the Community Center's names and activity. PUF ## 24 - 27. A jury could find that the counter-defendant is aware of this. A jury could find that if the Community Center is enjoined from using its names, then the plaintiff will be able to step into its shoes and take its bluesky and good will.

Dkt. #67 at 15.

In support of its contentions, defendant cites the declaration of Shari Denenberg, the manager and records custodian for defendant, who avers generally that during its 33 years of operation, defendant has helped "tens of thousands of needy individuals and families" by providing food, clothing and furniture for free or at reduced cost; donating "thousands of dollars" in cash and merchandise to local charities; and providing employment for community members "who might otherwise be unemployed or unemployable." Dkt. #45, ¶¶ 9-11, 13, 18. However, even if I accept these sweeping generalizations as true, defendant has not developed any argument or adduced any evidence showing that these services created "goodwill" for plaintiff in particular or that plaintiff had knowledge of this goodwill and

39

accepted it under inequitable circumstances without paying defendant for it. Defendant has presented nothing except a theory that plaintiff must have benefitted because defendant used a similar name to do good work in the community.

Defendant's theory will not suffice to defeat plaintiff's motion for summary judgment. Buckett, 2009 WI App 55, ¶ 31 (making similar finding with respect to defendant's theory regarding benefit plaintiff supposedly received). Moreover, defendant seems to be more concerned with the fact that, at some point in the future, plaintiff will capitalize on defendant's goodwill in the community by taking over defendant's operations. However, defendant's speculation about possible future damage is not a valid means of proving unjust enrichment. Fail-Safe, L.L.C. v. A.O. Smith Corp., 744 F. Supp. 2d 870, 898 (E.D. Wis. 2010) ("[A]warding a share of hypothetical future profits is an invalid way to value the benefit received by a defendant in an unjust enrichment action.").

As the Court of Appeals for the Seventh Circuit has held on numerous occasions, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003) (internal quotations omitted). Defendant has failed to meet this burden. Accordingly, I am granting plaintiff's motion with respect to defendant's unjust enrichment counterclaim, which will be dismissed.

E. Motion to Amend Pretrial Conference Order

The parties have filed a joint motion asking the court to strike the January 19, 2018 deadline for pretrial disclosures and motions in limine, the February 15, 2018 final pretrial conference and the February 20, 2018 trial date to allow sufficient time for resolution of the motions for summary judgment and trial preparation. The parties filed their motion on December 5, 2017, less than two weeks after their cross motions for summary judgment came before the court for decision. As the parties acknowledge, they have requested and were granted numerous extensions in this case, including a three-week extension of the deadline for filing dispositive motions. Dkt. #35. See also dkt. #49 (three-day extension of deadline for filing of dispositive motions); #64 (five-day extension of defendant's reply deadline); #72 (two-day extension of defendant's reply deadline); #75 (two-day extension of plaintiff's reply deadline). The parties were warned that no more extensions would be granted in this case, and typically, the trial date would remain firm. However, because I must strike the trial date in this case for other reasons, I will grant the parties' motion to amend the preliminary pretrial conference order. The clerk of court will set a telephonic scheduling conference before Magistrate Stephen Crocker to set new pretrial deadlines and a new trial date.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by plaintiff National Council of the United States Society of St. Vincent de Paul, Inc., dkt. #52, is GRANTED with respect to defendant's unjust enrichment counterclaim and affirmative defenses of abandonment,

equitable estoppel, acquiescence and waiver. The motion is DENIED in all other respects.

2. Defendant St. Vincent de Paul Community Center of Portage County, Inc.'s motion for summary judgment, dkt. #36, is DENIED.

3. The parties' joint motion to amend or correct the pretrial conference order, dkt. #83, is GRANTED. The remaining pretrial deadlines and trial date are struck. The clerk of court is directed to set a telephonic scheduling conference before Magistrate Judge Stephen Crocker for the purpose of setting new pretrial deadlines and a new trial date.

Entered this 29th day of December, 2017.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge